RANSOME CONCRETE MACHINERY CO. v. UNITED CONCRETE MACHINERY CO.

(Circuit Court of Appeals, Second Circuit.   March 7, 1910.)

No. 54.

PATENTS (§ 27*)—INVENTION—CONCRETE MIXER.

The Ransome patent, No. 814,803, for a concrete-mixing machine, consisting of a batch-mixing drum, in view of the prior Burns patent, No. 661,847, for an apparatus for mixing tea "and other material," even conceding that the Burns patent applies only to mixers of dry and nonsolidifying materials, is void for lack of patentable invention, being a mere adaptation to a double use, requiring only mechanical skill.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 31, 32; Dec. Dig. § 27.*]

Appeal from the Circuit Court of the United States for the Southern District of New York.

Suit in equity by the Ransome Concrete Machinery Company against the United Concrete Machinery Company.   Decree for complainant, and defendant appeals.   Reversed.

For opinion below, see 165 Fed. 914.

Stephen J. Cox, for appellant.
Edward S. Beach, for appellee.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

NOYES, Circuit Judge.   This is a suit to restrain the alleged infringement of letters patent No. 814,803, issued to Ernest Leslie Ransome on March 13, 1906, for an improvement in concrete-mixing machines, and assigned to the complainant.

The patentee states at the commencement of his specifications:

"My invention relates to that type of mixers known as 'batch mixers,' in which the material to be mixed is placed into the mixer a batch or charge at a time, and is in like manner discharged when mixed."

"Batch mixers" are to be distinguished from "continuous mixers." The latter are long cylindrical devices which receive materials and discharge them when mixed as a continuous operation.   They are said to be less effective than "batch mixers" in mixing the material and to be subject to other objections.

Broadly speaking, the structure of the patent consists of a revoluble drum with openings at both ends, blades or flanges within the drum secured to its inside periphery, and a discharging chute.   The materials for making concrete—cement, sand, stones, and water—are put into the drum through the inlet or charging opening.   The drum is then rotated.   The flanges both mix and elevate the material, and at the same time move it toward the discharge end.   When the mixing operation is completed, the materials are discharged through the chute.

The especial feature of the patent is undoubtedly the construction and arrangement of the flanges.   One set of flanges is set diagonally across the inside of the drum, so as to form lifting pockets at the discharge end.   Another set runs across the first set in the opposite di-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

rection. , By this arrangement the material is moved back and forth—lifted and thrown back—from one end of the drum to the other, and finally is elevated and dumped into the chute, which is adjusted to receive and discharge it at the outlet opening of the drum. The patentee in the patent says of this arrangement of flanges and their operation:

"To the inner surface of the drum, A, is fastened a plurality of shelves or flanges, B, the distinguishing feature of which is that they are placed athwart the width of the mixer in such a manner as not only to cause the mixing of material that comes within their sphere of influence when the mixer is revolving, but to move such material toward the discharge end of the mixer, and also to carry said material up and discharge it at such a height that when the chute, C, is placed in the required position, the mixture to be discharged from the machine falls therein. These shelves or flanges may be of any desired number or size."

And later he further says:

"When the mixer is fully charged and the drum is in motion, the material is given a constant movement over and down the inner surface of the drum, and down from the heights to which some of said material is carried by the shelves or flanges, and in addition to the described movements the material is moved by the plurality of shelves or flanges back and forth the width of the mixer, whereby the material is moved in a number of directions to obtain movements which are of great advantage in securing an intimate commingling of the materials."

The claims of the patent which it is contended that the defendant infringes are Nos. 2, 3, 5, and 7, which read as follows:

"2. A mixer having a revoluble drum adapted to receive material at one end and discharge it at the other, the drum having a centrally-orificed head at the discharge end, a shelf secured within the drum and extending along the inner side thereof diagonally with respect to the axis of the drum, the discharge end of the shelf extending to the head at the discharge end of the drum and forming a pocket in connection therewith, an additional shelf secured within the drum and extending diagonally of the axis thereof across the first-named shelf and a means extending through the said orifice in the discharge-head of the drum, for carrying off the material from the drum.

"3. A mixing apparatus having a revoluble drum, adapted to receive the material at one end and discharge it at the other end, a lifting-shelf secured to the drum against the inner side thereof, the shelf extending diagonally with respect to the axis of the drum for the major portion of the length of the shelf, and said major portion of the length of the shelf being relatively straight, and the shelf terminating at the discharge end of the drum in an offset portion, the concave side of which faces the direction of the revolution of the drum, whereby to form a lifting pocket."

"5. A mixing apparatus having a revoluble drum adapted to receive the material at one end and discharge it at the other end, a shelf secured in the drum against the inner side thereof, the shelf extending diagonally with respect to the axis of the drum for the major portion of the length of the shelf, and the shelf terminating at the discharge end of the drum in an offset portion, the concave side of which faces the direction of revolution of the drum, whereby to form a pocket, and an additional shelf secured in the drum and extending diagonally of the axis thereof across the first-named shelf."

"7. A machine of the class described, having a revoluble hollow member provided at its discharge end with a head, a plurality of shelves secured to the inside of the member and having offset ends disposed relatively to said head to form a series of lifting pockets adjacent to the discharge end of the revoluble member, and other shelves extending across the first-named shelves."

The defenses are:
(1) Invalidity.
(2) Noninfringement.

At the outset it is desirable to simplify the issues. Consideration of the question of infringement may be postponed until after the determination of validity. If the patent is invalid, other questions are immaterial. So, while prior patents and uses are set up to negative novelty, we may well consider them in the first place as showing the state of the prior art. It will not be worth while to carefully differentiate between structures, if the differences claimed to exist involve no invention. As want of invention in view of a prior device may defeat a patent which is not anticipated by it, the question of invention should receive primary consideration. Similarly we should select at the outset the defendant's best reference in the prior art. It is unnecessary to go over the whole field, if one patent advances more than all others toward the patent in suit.

Now it is unquestionable that the patent granted to Robert Burns on November 13, 1900 (No. 661,847), for an "improvement in apparatus for mixing tea and other material," if for an analogous purpose, is the nearest approach to the present patent. Before examining it in detail, however, we must consider the preliminary inquiry whether the apparatus covered by it is for a purpose analogous to that of the Ransome device.

The objection of nonanalogy proceeds upon the assumption that the Burns patent is for a tea mixer and the Ransome patent for a concrete mixer. As the complainant well points out, tea and concrete are widely different materials to be operated upon by mixing apparatus. Tea is dry, light, and nonadhesive. Its component granules are of uniform size and weight and of the same nature. A tea mixture is still tea. Time is not an element in tea mixing. Delays are immaterial. Concrete, on the other hand, is a mixture of different materials constantly tending to solidify into a stonelike substance. It is wet, heavy, and adhesive. The length of time required to mix it is most material. Indeed, the operation of mixing concrete is to some extent a race against its tendency to solidify.

If, then, the assumption be well founded that the Burns mixer is exclusively for tea and the Ransome mixer exclusively for concrete, the marked differences in the material operated upon may possibly afford ground for the contention that, if Ransome employs the Burns apparatus, he uses it for a new and nonanalogous purpose. But the assumption is not well founded. The Burns patent, as we have seen, is for apparatus for mixing tea "and other material." And in the body of his specifications Burns speaks of the use of the mixer upon other materials than tea:

"In working such tender material as tea leaves, it has been found advisable to have a less twist than can be employed for coffee or like material."

Moreover, the testimony is that Burns mixers—upon which his last patent was really an improvement—had been employed for mixing many materials other than tea and coffee, including sand. Similarly, while the patentee in the patent in suit says at the beginning that he has

invented an improvement in "concrete-mixing machines," the word "concrete" does not again appear in the patent. "Material" only is spoken of. In view of the language of the patent, we cannot say that the Burns apparatus is exclusively a tea mixer. Nor are we certain that the patent in suit should be treated as exclusively for a concrete mixer. Both devices are mixers. Their purpose is to mix materials. Changing materials does not change their purpose.

If, then, we treat the Burns patent as being broad enough to cover apparatus for mixing *any* materials, the question of analogous use does not arise. The mixer of that patent would be used for the purposes covered by it as well when employed to mix concrete as when used to mix tea. The only questions then arising would be whether the Ransome apparatus *is* the same as the Burns apparatus, and, if differences exist, whether they are of a nature involving invention.

But, while we are inclined to think that the Burns patent is broad enough to cover the use of the apparatus described in it for mixing all materials, including concrete, it is unnecessary for the purposes of this case that we should so rule. While, in view of the language of the patent, we cannot assume that it covers tea mixers alone, we shall assume, for the purposes of this discussion, that it applies only to mixers designed to commingle dry and nonsolidifying materials. The question, then, is whether its use for mixing wet and solidifying materials is for a new and nonanalogous purpose. And this resolves itself into the inquiry whether, in case the Burns mixer were used for mixing concrete, it would operate in substantially the same manner to accomplish substantially the same results as when used upon dry material. We think that it would. Notwithstanding the difficulties involved in mixing concrete, we are satisfied that the Burns mixer would act upon the required materials in the same way as upon other materials. The apparatus shown in the Burns patent, with all its appendages, is undoubtedly better adapted to mix a light, dry material than concrete; but we have no doubt that it would mix and discharge the one in the same manner that it would mix and discharge the other, and with quite similar results.

For these reasons we think the use of the Burns apparatus for the purpose of mixing concrete at the utmost only a double use, not involving invention. It is rather a case of changing the materials to be operated upon than of changing the method of operation. Indeed, it seems about as clear a case of double use as is shown in the well-known illustrations given by the Supreme Court in Potts v. Creager, 155 U. S. 597, 608, 15 Sup. Ct. 194, 198, 39 L. Ed. 275:

"If, for example, a person were to take a coffee mill and patent it as a mill for grinding spices, the double use would be too manifest for serious argument. So, too, this court has denied invention to one who applied the principles of the ice cream freezer to the preservation of fish. Brown v. Piper, 91 U. S. 37 [23 L. Ed. 200]."

See, also, Mast v. Stover, 177 U. S. 485, 20 Sup. Ct. 708, 44 L. Ed. 856.

We come now to the more difficult question whether Ransome has in fact used the Burns apparatus. In examining this question it is

only necessary to compare the essential features of the apparatus. This may be done as follows:

| Patent in Suit. | Burns Patent. |
|---|---|
| (1) Revoluble drum. | (1) Revoluble drum. |
| (2) Inlet. ⎫ Separate; one on each side of drum. | (2) ⎫ Inlet and outlet; opening on one side of drum only. |
| (3) Outlet. ⎭ | (3) ⎭ |
| (4) Discharge chute. | (4) Discharge chute; also used for charging. |
| (5) Lifting flanges and cross-flanges. | (5) Lifting flanges and cross-flanges. |
| (6) Flanges may be of any desired number or size. | (6) Flanges can be given any suitable twist or pitch. |
| (7) Flanges so placed as not only to cause mixing of material, but to move it toward discharge end of mixer and into discharge chute. | (7) An incline leading from flanges to discharge chute. |
| (8) Discharge chute can be adjusted to act as practical closure for outlet end and to prevent splashing out. Doors at both ends for same purpose. | (8) Chute can be adjusted to act as closure for opening to prevent escape of materials. |
| | (9) Roof-shaped spreader. |

It is evident from this comparison that the apparatus of the patent in suit contains most of the broad features of the Burns structure. Indeed, this is not seriously disputed by the complainant; the only difference which it points out being the following:

(1) The Burns drum is not open at both ends, as is the apparatus of the patent.

(2) The interior of the Burns drum is provided with a roof-shaped spreader. The structure of the patent has no spreader.

(3) It is contended that the flanges shown in the Burns patent are so arranged as to form "neutral zones," which fail to properly commingle the material. The apparatus of the patent in suit is said to possess no such "neutral zones."

The difference between the openings of the two mixers constitutes, in our opinion, the most important distinction between them. In the Burns mixer, as already pointed out, the inlet and outlet are at the same end of the drum, and a single chute serves for charging and discharging. The materials to be mixed are fed into the drum through the chute. The chute is then adjusted to close the opening, and the mixing operation goes on. When the materials are mixed, the chute is swung inside the drum, and receives and discharges the materials. In the Ransome mixer, as we have also seen, the drum has openings in both ends. The materials are put in through the inlet or charging opening. The openings in the drum are closed; the chute at the discharging end being swung to so as to practically accomplish such closure at that end. The mixing operation then goes on. When it is completed, the discharge chute is swung inside the drum, and receives and discharges the mixed materials.

But, while this difference in the construction and operation of the two mixers thus exists, it is by no means clear that it required invention to modify the Burns mixer, so that it could be charged and discharged at opposite ends of the drum. The only thing necessary to be

done was to take off the plate at the rear end of the drum, which was either bolted in place or connected with a flue, and feed the mixer through the opening thus obtained. Mechanical skill would seem to have been quite sufficient to accomplish this result. Moreover, it can hardly be said that invention would have been required to make an entirely new opening in the rear end of the drum. Mixers which received the materials at one end and discharged them mixed at the opposite end were old in the art at the time when the Burns patent was granted. Indeed, that form of construction seems to have been much more commonly used than the Burns form.

The advantage of an opening at each end of the drum is rapidity in operation. There is nothing in the testimony to show that there is any functional advantage, or that—assuming equal rapidity and the elimination of the shed and "neutral zones" to which we have referred—the Burns mixer would not mix concrete as well as the Ransome mixer. We present, then, to a skilled mechanic the problem of increasing the rapidity of the operation of the Burns mixer, so as to mix concrete materials in the face of their tendency to solidify. He knows that old concrete mixers received the materials at one end and discharged at the opposite end. He appreciates the delay caused by adjusting a single chute to both receive and discharge materials. While we recognize the difficulty of drawing a line between mechanical skill and invention, we think that the former should have been sufficient to teach this person skilled in the art to eliminate the double use of the one chute and to duplicate it at the opposite end—to go back to the old method of having separate inlet and outlet.

The next difference between the Burns mixer and that of the patent in suit which the complainant points out is the roof-shaped spreader, which appears in the former, but not in the latter. Burns says this of the spreader in his patent:

"In the drum is shown a stationary flange, or, as it might be called, a 'roof-shaped spreader,' s. This flange, s, is serviceable, since it tends to spread or scatter material falling from the upper part of the drum, whereby the mixing or blending is aided. This flange, s, also breaks the fall of material between the upper and lower portions of the drum, Such breaking of the fall is of advantage, for example, in the blending of tea leaves, since it is desirous to have the leaves injured or broken as little as possible."

It is clear from the testimony that the spreader is especially designed to break the fall of delicate materials like tea. It might also cause a more thorough mixture of certain other materials. But it is not useful in mixing concrete as the different kinds of material in spreading would tend to segregate. The spreader, however, is merely an adjunct or appendage to the mixer, and only mechanical skill would be required to omit it. Indeed, the testimony shows that Burns himself did not include the spreader when making mixers for certain materials.

The final difference which the complainant contends exists between the Burns apparatus and that of the patent in suit lies in the creation of certain "neutral zones" in the former. These zones are said to be created by the following construction: In the drawings of the Burns patent each pair of flanges which extend convergingly from the rear end of the drum toward the front end after meeting extend to the

front plate in lines parallel to the axis of the drum and make lifting pockets. These pockets are said to constitute "neutral zones" and to be objectionable. The patentee says in his testimony:

"Owing to the fact that the lifting pockets are parallel to the axis of the drum, an internal zone is created for a portion of the way across the drum that is not affected directly by the commingling blades. As a consequence, in mixing the material is carried by these lifting pockets and dropped, falls again upon the zone of the pockets, and is not, in my judgment, properly commingled with the matter in the other parts of the drum."

It may well be doubted whether the difficulty which the patentee points out would arise to any considerable extent in the actual operation of the Burns mixer, even if constructed precisely in accordance with the drawings of the patent. It would seem that, when the material falls from the lifting pockets, it would strike other material at the bottom and tend to move toward the rear of the drum. But, however that may be, there is nothing in the Burns patent to confine it to the precise arrangement of the cross-over blades shown in the drawings. And, if it were confined to such particular arrangement, a rearrangement of them to obviate the defect of "neutral zones" would require no more than mechanical skill. Furthermore, it is by no means clear that the structure shown in the drawings of the Ransome patent is wholly free from "neutral zones." It does not appear that all the lifting pockets shown are affected directly by the commingling blades.

Therefore, while we appreciate the usefulness of that which the patentee has accomplished, we are constrained to hold that the differences between the apparatus of the patent in suit and that of the Burns patent do not involve invention, and, consequently, that the former patent is invalid.

The decree of the Circuit Court is reversed, with costs, and the cause remanded, with instructions to dismiss the bill with costs.